IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| CLASSIC AMERICAN HOMES and MYLES CLUFF, | ) ) ) | |
| Plaintiffs, | ) | TC-MD 180102N |
| v. | ) ) | |
| WASHINGTON COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

Plaintiffs appeal the real market values of properties identified as Accounts R2199427, R2199429, R2199430, R2199431, R2199433, R2199434, and R2199435 (subject properties or subject lots) for the 2017-18 tax year. A trial was held in the Oregon Tax Court courtroom on August 29, 2018, in Salem, Oregon. Tom Brewer (Brewer), an Oregon licensed real estate broker, appeared and testified on behalf of Plaintiff. Myles Cluff (Cluff), Plaintiff and owner of Classic American Homes, also testified on behalf of Plaintiffs. Adrienne Wilkes, Appraisal Supervisor, appeared on behalf of Defendant. Trent Youngren (Youngren), registered appraiser, testified on behalf of Defendant. Plaintiffs' Exhibits 1, 2, 4, 6 to 20, and 22 and Defendant's Exhibits A to C were received without objection. Plaintiffs' Exhibits 3, 5, and 21 were received over Defendant's objection.[2]

/ / /

/ / /

---

[1] This Final Decision incorporates without change the court's Decision, entered December 18, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] Exhibits 3 and 5 contain appraisal reports and Exhibit 21 contains market trends. Defendant objected to those exhibits because the authors were not available to answer questions under oath concerning the exhibits. The court will address Defendant's concerns in weighing the exhibits.

## I. STATEMENT OF FACTS

A.      *Subject Properties*

The subject properties are seven of nine lots in the Ironwood Gardens subdivision located 10 miles northwest of downtown Portland in an unincorporated area of Washington County. (Ptfs' Ex 1 at 1; Def's Ex A at 5.)  They were newly platted as of January 1, 2017.  (Ptfs' Ex 1 at 1.)  Brewer testified that the subdivision is in the Bonny Slope neighborhood.  The subject lots are located on Levi Lane, a private street with a 25-foot right of way; no street parking is allowed, so guests must park on the public road and access the houses via a pathway.  (*See* Ptfs' Ex 19 at 1.)  Homeowners will be required to form an association to maintain the private street.

Youngren testified that the subject properties are in the R6 zone, so the minimum lot size is 4,000 square feet and the maximum size is 8,000 square feet.  Excluding lot 5, the subject lots range in size from 5,737 to 6,068 square feet.  (Ptfs' Ex 1 at 5.)  Lot 5 is 7,264 square feet.  (*Id.*)  Brewer testified that lots 5 and 6 are "flag lots" due to their long driveways.  Youngren testified that he did not consider lot 5 a flag lot because, typically, flag lots are located behind another building.[3]  He agreed that lot 5 contains extra land that is only functional for a driveway, but noted the building envelope is "very similar" to the other lots in the subdivision.  The parties agreed that the lots are "permit ready," meaning utilities are stubbed to the lots.  Brewer testified that the lots are level and are not subject to overlays or impacted by environmental issues. Youngren testified that the subject lots do not contain any surplus or excess land.

/ / /

---

[3] Youngren noted that the appraisal report provided by Plaintiffs did not identify the subject properties as including any flag lots.  (*See* Ptfs' Ex 3 at 9.)  Brewer testified that he thinks lot 5 functions similarly to other lots in the subdivision after adjusting for the fact that it is a flag lot.

Brewer provided plans depicting how houses would be sited on the lots and the backyard depths. (*See* Ptfs' Ex 9.) He testified that the subject lots will support houses ranging in size from 2,700 to 3,100 square feet. (*See also* Ptfs' Ex 3 at 26.) Backyard depths for the subject lots range from 18 to 28 feet, excluding lot 9 with a 15-foot depth, but an expanded side yard. (*Id.*) Brewer testified that, in his professional experience, a buyer will spend an additional $20,000 for a 45-foot backyard depth as compared with a 22-foot depth. Youngren testified that he did not observe a market impact based on backyard depth. (*See also* Def's Ex C at 2.) He testified that, in his experience, all new homes in the area have small backyards like the subject lots.

B.    *Market Area*

The Bonny Slope neighborhood is composed of high-quality custom and semi-custom detached single-family houses built between 1997 and 2017. (Def's Ex A at 5.) Youngren testified that the location is proximate to downtown Portland and within a desirable school district. He reported that values ranged from $650,000 to $1 million with a median value of $730,000 for a house on a 7,500-square foot lot. (*Id.*) Brewer testified that the median price was $695,000 and the average price was $684,000.

Several other subdivisions are in the subject neighborhood: Kinsley Terrace ($800,000 to $900,000); Ironwood Terrace ($900,000 to $1,100,000); Ironwood East ($700,000 to $950,000); and Iron Ridge Place ($675,000 to $750,000). (Def's Ex A at 8.) Youngren testified that Kinsley Terrace was developed at the same time as the subject properties. Ironwood Terrace, across from the subject properties, is superior. Ironwood East is very similar to the subject properties and was also developed by Plaintiffs. Iron Ridge Place is an older infill development that is not as high quality as the subject properties.

/ / /

The parties agree that all development in Bonny Slope is infill due to limited land; there are no vacant lots in the neighborhood. Brewer testified that builders can no longer get lots within the urban growth boundary and developers have been pushed out of the market. A builder will not build to suit in a subdivision unless the builder owns the lot. The only new houses on the market are builders' "spec" houses. RMLS data from 2017 revealed 287 new houses sold in the subject properties' zip code, but only six lots sold in that time. (Ptfs' Ex 22; Def's Ex C at 26[4].) Youngren noted that the average sale price of the lots was $288,833 and the median sale price was $310,000. (Def's Ex C at 26.) Brewer testified that he does not think lot sales are the most reliable value indicator because there were so few of them.

C.     *Real Market Value Evidence*

    1.     *Sales from the subject subdivision*

Brewer testified that lots 2 and 6 each sold to a buyer with a contract to build a house on the lot. (*See also* Ptfs' Exs 4, 6.) Lot 2 sold on January 30, 2017, for a total contract price of $742,914 for a 3,149-square foot house with $240,000 allocated to the lot. (Ptfs' Ex 4 at 1-2, 24.) That lot value is 32.3 percent of the contract price. (*See id.* at 1.) A lending appraisal of lot 2 and the planned house concluded a value of $748,000 as of February 22, 2017, with $235,000 allocated to the lot. (Ptfs' Ex 5 at 4-6.) Once completed, the house on lot 2 sold for a recorded price of $786,879 on October 30, 2017.[5] (Def's Ex C at 3.) Lot 6 sold on February 16, 2017, for a total contract price of $723,326 for a 2,749-square foot house with $235,000 allocated to the lot. (Ptfs' Ex 6 at 1-2, 24.) That lot value is 32.48 percent of the contract price. (*See id.*) The

/ / /

---

    [4] Brewer's search yielded seven lot sales, but Youngren testified that one of them was not buildable.

    [5] The difference between the contract price and the actual price was presumably due to the $113,000 in allowances for additional features included in the contract. (*See* Ptfs' Ex 4 at 23.)

lender was unable to provide a copy of the appraisal of lot 6. (Ptfs' Ex 7.) Once completed the house on lot 6 sold for a recorded price of $741,895 on September 28, 2017. (Def's Ex C at 5.)

Cluff testified that he advertises his lots with signs and through word of mouth, which he has found to be sufficient. Listing through RMLS requires a five to seven percent real estate commission, so he avoids it. Brewer testified that, when a potential buyer wants to buy one of the lots, Plaintiffs provide a price range to build a house that includes the cost of the lot. A buyer may not select a different builder. If the lot price were too high, the buyer would recognize that. Plaintiffs' prices are determined based on the surrounding market. Builder's profit is typically 10 to 15 percent. Youngren testified that he does not think build-to-suit lots are openly marketed and he removes all such lots from market studies.

2.     *Sales comparison approach*

Brewer testified regarding nine lot sales, some of which were also used by Youngren in his sales comparison approach. (*See* Ptfs' Exs 10-18; Def's Ex A at 12.) He adjusted for time based on Defendant's ratio studies: 6 percent in 2014, 18 percent in 2015, and 9 percent in 2016. (Ptfs' Ex 20.) Youngren testified that he looked for sales of lots in the R-6 zone with similar attributes as the subject lot: location, size, and "phase of development," *i.e.*, "permit ready." He adjusted each comp for time and adjusted comps 3, 4, and 5 for surplus land at $4.50 per square foot based on a paired sales analysis of lots over 7,405 square feet.

| Ptf | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 | Comp 8 | Comp 9 |
|---|---|---|---|---|---|---|---|---|---|
| Date | 5/5/17 | 7/31/17 | 4/05/17 | 4/22/16 | 7/30/14 | 8/3/17 | 2/27/18 | 1/9/15 | 6/02/14 |
| Lot | 9,148 SF | 6,970 SF | 6,970 SF | 12,632SF | 7,841 SF | 7,405 SF | 6,970 SF | 6,098 SF | 11,326SF |
| Imp. | 2,018 SF | 3,206 SF | 3,075 SF | 5,039 SF | 3,798 SF | 4,188 SF | N/A | 3,123 SF | 3,504 SF |
| Price | $185,000 | $250,000 | $225,000 | $280,000 | $216,000 | $300,000 | $300,000 | $175,000 | $200,000 |
| Adj. | $198,000 | $236,878 | $219,937 | $296,800 | $284,764 | $260,562 | $268,500 | $225,085 | $266,243 |
| | | | | | | | | | |
| Def | | | | Comp 4 | Comp 3 | Comp 1 | Comp 2 | | |
| Lot | | | | 12,600SF | 7,841 SF | 7,400 SF | 7,000 SF | | |
| Adj. | | | | $277,600 | $286,200 | $277,000 | $267,000 | | |

/ / /

Youngren's additional comp 5 was a 10,454-square foot lot that sold for $300,000 on January 23, 2016. (Def's Ex A at 12.) He adjusted the sale price to $280,000. (*See id.*)

        a.      Plaintiffs' comparable sales analysis

In Brewer's view, the three best comps were 2, 7, and 8, despite the time adjustments required for 7 and 8. (Ptfs' Ex 19 at 1.) Brewer testified that he was the selling agent for comp 1 and the seller had to bring utilities to the lot; there were no curbs, sidewalks, or lights on the street. Comp 1 is located on a street with several older houses built in the 1950s and 1960s, including a 1.5-acre lot with an unattractive yard. (*See* Def's Ex C at 13 (photo).) Brewer testified that his comps 2 and 3 were located on the same street as comp 7, but comp 3 did not represent an arm's-length transaction. He did not consider comp 4 a good comp for the subject lots because it is over twice as large supporting a 5,039-square foot house with a 982-square foot garage. (*See* Ptfs' Ex 13 at 1.) Brewer testified that comp 9 lies within a riparian corridor, which impacts the siting of the house. He testified that comp 9 is the most desirable location of any of his comps due to its privacy and proximity to greenspace.

Youngren testified that Brewer's comp 1 required too many adjustments and the seller was in some distress when the taxes increased due to the availability of sewer service. (*See also* Ptfs' Ex 10.) He testified that comps 2 and 9 were each build-to-suit, so the lot price was extracted from the contract to build. Youngren testified that the comp 2 buyer did not view $250,000 as the lot value, but rather as the down payment to start construction on a new house. He testified that comp 8 was marketed online for months, but in conjunction with a contract to build a house, so he did not consider it. Youngren testified that comp 9 was a true flag lot with numerous issues due to the riparian area, so he did not use it.

/ / /

b.     Defendant's comparable sales analysis

Youngren testified that his comp 1 was located 0.5 miles from the subject property; it was permit-ready with a 20-foot deep backyard. Some atypical aspects of the sale brought the price to about $295,000. Comp 2 was in the Bonny Slope neighborhood about one mile from the subject properties. Comp 3 was located about two miles from the subject properties. Even though comp 3 sold in 2014, Youngren compared it to the adjacent lot (comp 4) that sold in 2016. (*See* Def's Ex A at 12-13.) He testified that comp 5 was larger than the subject lots and was in a superior location closer to Portland, which he adjusted for. Youngren testified that he gave the most weight to comp 1, then comp 2, and less weight to comps 3 to 5.

Brewer testified that Youngren's comp 5 is not comparable to the subject lots, noting houses in that area sell for over $1 million. (*See* Def's Ex A at 12.)

c.     Comparable lot size range

The parties dispute the range of lot sizes that are comparable to the subject lots. Brewer questioned the validity of using lots of 7,000 square feet or more, noting that the RMLS uses lot size categories of 0 to 2,999; 3,000 to 4,999; 5,000 to 6,999; 7,000 to 9,999; 10,000 to 14,999; and 15,000 to 19,999. (Ptfs' Ex 19 at 1-2.) He testified that builders prefer houses that are at least 3,500 square feet because the profit margins are better. Larger lots accommodate larger houses and larger yards. For instance, Brewer testified that another lot in the same subdivision as his comp 6 is 6,500 square feet with a 3,900-square foot house; the extra 500 square feet in the lot made a big difference in the house size. (*See also* Def's Ex C at 1.)

Youngren testified that he did not see a sufficient market impact in the lot size range of 6,000 to 7,400 square feet to make any size adjustment. Plaintiffs provided a lending appraisal of the subject subdivision prepared by Richard P. Herman (Herman), MAI, on November 1,

2016. Herman's appraisal report stated that "[t]he common requisites of this market segment are lots that are 5,000 square feet to 10,000 square feet in size that are able to accommodate 40 to 60-foot-wide structures." (Ptfs' Ex 3 at 28.) Herman also used lots of 6,000 to 11,000 square feet as comps. (*Id.* at 55.)

3.    *Lot cost ratio*

Plaintiffs' appraisal by Herman concluded a value of $220,000 per lot. (*See* Ptfs' Ex 3.) Herman used the sales comparison approach to analyze individual lot values, concluding an adjusted price range of $175,000 to $270,000 per lot. (*See id.* at 55, 60.) He also determined that the "value capacity," which roughly correlated with lot price, ranged from $624,950 to $855,000, yielding a "lot cost ratio" range of 26.7 to 32 percent, excluding one apparent outlier of 42.3 percent. (*See id.*) Herman determined a lot value of $240,000 for the subject lots 1 through 5 and $200,000 for the subject lots 6 through 9. (*Id.* at 60.) He wrote that, "[b]ased upon the vertical build price agenda established by the developer [$675,000 for the north lots and $600,000 for the south lots], the resulting lot cost ratio relative to the average vertical build value is aggressive at 33.3 percent to 35.6 percent when compared to the lot cost range reflected by the comparables of roughly 27 percent to 32 percent." (*Id.*) Herman's average lot cost ratio for the subject lots was 34.6 percent. (*Id.*) Brewer testified that the typical market range for lot value as a percentage of total value is 25 to 35 percent.

Youngren testified that he found several deficiencies with Herman's appraisal, including the lack of time trends despite sales from June 2014 to April 2016, during which the market increased by about 30 percent. He disagreed with Herman's "vertical build benchmark," finding $750,000 to $850,000 to be the typical vertical build in Bonny Slope as of January 1, 2017. The two lots that sold in the subject subdivision exceeded Herman's vertical build price agenda:

$786,879 for lot 2 and $741,895 for lot 6.  Youngren testified that the lot cost ratio can yield significantly different land values depending on the quality of construction.  Brewer testified that the lot cost ratio varies with the size of the improvement; a builder could use a 35 percent lot cost ratio on a $1 million house, but a lower ratio on a smaller lot and house.

D.      *Tax Roll, BOPTA, and Requested Values*

The subject properties' original tax roll real market values were each $325,310.  (Compl at 2-8.)  The Board of Property Tax Appeals (BOPTA) reduced those values to $285,000 each. (*Id.*)  Because the subject properties were new as of January 1, 2017, the exception real market value is the same as the real market value and maximum assessed value must be adjusted for any reduction in real market value.  (*See id.*)  Plaintiffs request a real market value of $217,500 for lots 1 and 9, and a real market value of $225,000 for lots 3, 4, 5, 7, and 8.  (Am Compl at 1.) Defendant requests a real market value of $275,000 for each lot.  (Def's Ex A at 3.)

## II.  ANALYSIS

The issue presented is the real market value of the subject properties for the 2017-18 tax year.  "Real market value is the standard used throughout the ad valorem statutes except for special assessments."  *Richardson v. Clackamas County Assessor*, TC-MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).  "Real market value" is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).[6]  The assessment date for the 2017-18 tax year was January 1, 2017.  ORS 308.007; ORS 308.210.

/ / /

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2015.

Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a)[7]; *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003). Although all three approaches must be considered, all three approaches may not be applicable in each case. *Id.* In addition to the three approaches to value, a recent sale of the subject property "is important in determining its market value. If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973).

As the parties seeking affirmative relief, Plaintiffs bear the burden of proof by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Sales in Subject Subdivision – Market Extraction*

Two lots within the subject subdivision sold in January and February 2017 for $240,000 and $235,000 as part of contracts for Plaintiffs to build houses on the lots. The total contract prices were $742,914 and $723,326, with final recorded prices of $786,879 and $741,895 on October 30, 2017, and September 28, 2017, respectively.

---

[7] Oregon Administrative Rule (OAR).

In the "market extraction" method, "land value is extracted from the sale price of an improved property by deducting the contributory value of the improvements. The remaining value represents the value of the land." Appraisal Institute, *The Appraisal of Real Estate* at 368 (14th ed). The market extraction method – along with other alternative methods – may be used to determine land value "[w]hen there are not enough sales of similar parcels for the application of sales comparison," for instance in "densely developed urban locations" where "vacant parcels of land" are "so rare that their values cannot be estimated reliably by direct comparison." *Id.* at 364, 368. The market extraction method is most applicable when "[t]he improvements are new, their cost is known, and there is little or no depreciation from any causes." *Id.* at 365.

Some facts in this case support the use of market extraction to determine the subject properties' real market values. First, the relevant market area was characterized by few vacant lot sales. In 2017, only six buildable lots sold in the subject properties' zip code. Second, the two sales from the subject subdivision were of new houses and the improvement costs were relatively well supported by detailed cost statements attached to the contracts. Defendant maintains that no weight should be placed on the allocated lot prices because they are build-to-suit and, therefore, not openly marketed. It is true that the pool of buyers is limited to those willing to purchase a house constructed by Plaintiffs (rather than another builder) and within a specified value range. However, those sales were recent and arm's-length. Even though Plaintiffs restricted the market of buyers, there was sufficient demand such that Plaintiffs only needed to engage in limited advertising through signs and word of mouth. The court is convinced that weight should be placed on the allocated lot prices from sales within the subject subdivision.

/ / /

B.  *Sales Comparison Approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp. v. Lane County Assessor,* TC-MD 060354D, WL 1068455 at *3 (Apr 3, 2007), citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001).  "In utilizing the sales comparison approach, only actual market transactions of property comparable to the subject, or adjusted to be comparable, may be used.  All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."  OAR 150-308-0240(2)(c).

Each party presented evidence of lot sales from 2014 through 2018.  Brewer presented nine such sales, though he did not consider all of them comparable to the subject properties.  He adjusted his sales for time, finding adjusted prices ranging from $225,085 to $268,500 for the three most comparable (2, 7, and 8).  Two of Brewer's most comparable sales – 2 and 8 – were sold in conjunction with a contract to build a house.  Youngren presented five sales adjusted for time and other differences.  He placed the most weight on two sales with adjusted prices of $277,000 and $267,000, concluding an indicated value of $275,000.

All the lot sales presented were larger than the subject lots.  Youngren's smallest lot was 7,000 square feet, which is about 1,000 square feet larger than the subject lots.[8]  The parties dispute the impact of lot size on value within the range of 6,000 to 7,400 square feet.  Youngren found none, but Brewer noted the impact on the allowable house size.  The subject lots support houses ranging from 2,700 to 3,100 square feet.  By contrast, Defendant's comparable sales supported houses ranging from 3,798 to 5,039 square feet.[9]  Plaintiffs' most comparable sales

---

[8] The subject lots range in size from 5,737 to 6,068 square feet, except for lot 5, which is 7,264 square feet. After adjusting for driveway access, the building envelope of lot 5 is very similar to the other lots.

[9] That range represents three of Defendant's five comparable sales; no information was provided for two.

supported 3,206 and 3,123-square foot houses. The court is convinced that, in the subject market, the allowable house size impacts the lot value. Accordingly, Defendant's real market value conclusion of $275,000 is overstated.

The court finds less weight should be placed on the sales comparison approach due to the lack of vacant lot sales around the January 1, 2017, assessment date. Sales remote in time from the assessment date are less persuasive due to the large time adjustments required for rapidly changing market conditions.

C.      *Lot Cost Ratio*

Plaintiffs presented a lending appraisal prepared November 1, 2016, which found an adjusted price range of $175,000 to $270,000 per lot and concluded a value of $220,000 per lot. The appraiser who prepared the report, Herman, was not available to testify at trial. Defendant noted several deficiencies with the appraisal, about which it could not question Herman. For those reasons, the court places little weight on Herman's value conclusion. Nevertheless, Herman's appraisal report offered another method by which to analyze real market value: lot cost ratio. The ratio is the value of the lot as a percentage of the total value including improvements. Herman found lot cost ratios ranging from 26.7 to 32 percent based on his comparable sales, though he selected an "aggressive" ratio of 34.6 percent for the subject lots. Brewer testified that the typical market range is 25 to 35 percent. The parties noted limitations with the method, including variation based on the quality of construction and the improvement size.

The lot cost ratio is an allocation method, which is defined as a "ratio of site value to property value * * * extracted from comparable sales in competitive locations and applied to the sale price of the subject property to develop the site value." *Werth Family LLC v. Yamhill*

/ / /

*County Assessor*, TC-MD 110652C, WL 6185598 at *5 (Dec 12, 2012) (internal quotation marks

omitted), citing Appraisal Institute*, The Appraisal of Real Estate* 363 (13th ed 2008).

> "In situations where there is limited sales data, the allocation method does not
> produce credible value indications, but it can be used to establish approximate
> land value when the number of vacant land sales is inadequate. For example, an
> appraiser could use allocation to value the site for a new one-unit home in a large,
> newly developed subdivision where few sales of vacant land have occurred but
> credible data from several recent sales of improved properties is available.

*The Appraisal of Real Estate* at 369. Additionally, "[m]eaningful support for an allocation ratio

may be derived from a variety of sources such as observed patterns over time in an area and

consultation with developers who sell improved properties and can allocate sale prices between

the land and the improvements based on their costs." *Id.* "The most common application [of the

allocation method] is in residential subdivision lot sales analysis, where the appraiser can directly

measure the ratio of lot value to total property value." *Id.*

Here, Herman's value conclusions for the subject lots were too low because he used a

vertical build price agenda of $600,000 and $675,000 for the subject lots. The two sales from the

subject subdivision yielded total sale prices of $741,895 and $786,879. Applying the lot cost

ratio range of 26.7 to 32 percent to those prices yields lot prices ranging from $198,086 to

$251,801. Applying Herman's proposed lot cost ratio of 34.6 percent for the subject lots yields

lot prices of $256,696 and $272,260. As noted above, the allocation method may provide an

approximate land value; here, a range of values. However, the court places limited weight on

this method of due to the limitations noted by the parties and the large value range indicated.

D.      *Reconciliation*

The valuation methods indicate a real market value range of $235,000 to $275,000 per

lot. Values at the low end of the range are supported by the market extraction method, whereas

values at the high end of the range are supported by the sales comparison approach. The court

places more weight on the market extraction method in this case due to the limited availability of vacant lot sales and the use of comparable lots that exceeded the subject lots in size. The court concludes the real market value of each of the subject lots was $240,000 as of January 1, 2017.

## III. CONCLUSION

Upon careful consideration, the court concludes that the 2017-18 real market value of each of the subject properties was $240,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2017-18 real market value and exception real market value of each of the properties identified as Accounts R2199427, R2199429, R2199430, R2199431, R2199433, R2199434, and R2199435 was $240,000.

Dated this ___ day of January 2019.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer and entered on January 8, 2019.*